THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDDIE JEFFERSON, Defendant-Appellant.

First District (2nd Division)   No. 1—89—0308

Opinion filed March 18, 1992.

492

Randolph N. Stone, Public Defender, of Chicago (Tina Liebling, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall E. Roberts, and Gigi Gilbert, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Freddie Jefferson appeals from his conviction by a jury of the murder of Tammy Washington on the grounds that (1) the trial judge gave improper instructions on accomplice liability; (2) the prosecutor made inappropriate remarks during his closing argument; and (3) the trial judge improperly questioned the defendant and impermissibly commented on the evidence. Defendant seeks a reversal of his conviction with a remand for a new trial.

On the evening of June 14, 1987, defendant and his half-brother Fleener Jefferson drove to the 6800 block of South Winchester in Chicago where Eric Green lived. Green had been involved in a fight

with Fleener's half-brother Joe Jefferson[1] that afternoon. When Fleener and defendant arrived, Fleener pointed to Green, who was walking into view, and identified him as Joe's assailant. Defendant had Fleener's loaded .32 caliber revolver, which Fleener had given to him before they left. After they had gotten out of their car, Green started running. According to defendant's testimony, Fleener said "shoot, shoot," and defendant fired "about three or four times." Green testified that he heard about four shots and felt some bullets passing by. Tammy Washington, 13 years old, who was jumping rope on the sidewalk in front of her grandmother's house at 6840 South Winchester, was shot and killed.

Defendant testified on direct examination that he shot "at the ground *** just to scare" Green; that he did not deliberately try to shoot or kill Eric Green; and that he was under a sudden and intense passion at the time of the shooting. However, on cross-examination, defendant admitted that he was not firing "up into the air" or "straight down into the ground." He also admitted that he saw some people "behind Eric Green as he was running down the sidewalk."

Three eyewitnesses, Brian Banks, Lena Robinson and Leon Coleman, testified as to the shooting. Banks testified that defendant "was standing in the middle of the street shooting, shooting, following Eric Green running." Banks continued, "He was shooting across the street, Eric—because Eric was running he was following him shooting." In demonstrating the manner in which defendant was shooting, the record reflects "that the [defendant] had his arm extended and his fingers in the shape of a gun moving back and forth." Robinson testified that defendant "got out of the car and he aimed. He just started shooting bang, bang, bang." She also stated that defendant's arm was extended and that "his legs were bent" as he was firing. Robinson further testified that she "heard him shooting and saw him when he got out of the car and aiming the gun and shot," that "he was not shooting at the ground," and that there were bullet holes in the side of her house. Coleman's testimony was that he "saw Freddie Jefferson shooting at Eric Green," and in demonstrating the manner in which defendant was shooting, the record reflects that "the [defendant] had his arm extended and

---

[1]The record indicates that, for some obscure reason, Joe is a Jefferson; however, only the defendant and Fleener have the same father; Fleener and Joe have the same mother.

his hands and fingers positioned as a gun and going across in a shooting motion."

Each of the three witnesses picked defendant out of a lineup and identified him in court. Green also picked defendant out of a lineup. In addition, the Cook County assistant medical examiner testified that Washington's round wounds were not characteristic of ricochet wounds. However, she admitted on cross-examination that it would be possible for an imperfect or ricochet bullet to leave a round hole.

Defendant was charged with the attempted murder of Eric Green and the transferred intent murder of Tammy Washington. The jury convicted him on both charges. The trial judge vacated the conviction for attempted murder and sentenced defendant to 40 years' imprisonment on the murder conviction. We affirm.

## I

Defendant claims that the trial judge erred in instructing the jury on accomplice liability because he was the principal wrongdoer and not an accomplice. The instruction at issue was given as follows:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

Pursuant to the Illinois Pattern Jury Instructions (IPI) Committee Note to this instruction, the phrase "or one for whose conduct he is legally responsible" was inserted after the word "defendant" in each proposition of the issues instructions for the offenses of attempt murder, murder and involuntary manslaughter with which the defendant was charged. According to defendant, the jury understood the accountability instruction to mean that Fleener's mental state could be held against him. In support of this claim defendant cites the following remarks, which were made by the trial judge outside the presence of the jury:

> "THE COURT: [T]wo people [are] acting in concert with a conspiracy to commit a crime and they succeed.
>
> * * *
>
> So that what you are really doing is taking the conduct of both gentlemen and tag the intent of both gentlemen to decide whether Freddie is guilty of murder or not.

[DEFENSE]: The point that I am making, judge, is how can you hold Freddie accountable for Fleener's state of mind? You can't be held accountable for another man's state of mind.

THE COURT: The idea is that they didn't have a separate state of mind, that they both have the same state of mind and it's by using both their actions you determine that state of mind."

Defendant argues that the improper instruction allowed the jury to convict him "without making any finding as to his mental state" in violation of his right to due process of law. *Carella v. California* (1989), 491 U.S. 263, 265, 105 L. Ed. 2d 218, 221, 109 S. Ct. 2419, 2420 ("The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense"); *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.

■ The State conceded during oral argument before this court that because defendant's participation as principal was clearly established by his own testimony at trial, the judge's giving of the accountability instruction to the jury was improper. (See *People v. Lusietto* (1976), 41 Ill. App. 3d 205, 207 ("guilt predicated on an accountability theory is proper only if the other evidence is inconclusive as to defendant's direct participation in the crime").) Defendant contends that the erroneous instruction constitutes reversible error. (See *People v. Payne* (1990), 194 Ill. App. 3d 238; *People v. McCauley* (1972), 2 Ill. App. 3d 734, 736 ("It is reversible error to inject into the case, by way of instruction, issues which are not properly before the jury. [Citation]").) However, "[e]ven an inappropriately given accountability instruction does not constitute reversible error where, as here, sufficient evidence was adduced from which the jury could find defendant guilty as principal. (*People v. Andrews* (1981), 95 Ill. App. 3d 595, 598, 420 N.E.2d 509; *People v. Lusietto* (1976), 41 Ill. App. 3d 205, 208, 353 N.E.2d 385.)" *People v. Faysom* (1985), 131 Ill. App. 3d 517, 528; see also *People v. Finch* (1946), 394 Ill. 183, 191, *cert. denied* (1946), 329 U.S. 786, 91 L. Ed. 673, 67 S. Ct. 298; *People v. Lehner* (1929), 335 Ill. 424, 429-30; *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 332, *appeal denied* (1990), 135 Ill. 2d 559.

Because defendant claims that the improper instruction violated his fourteenth amendment right to due process of law, we assess the error under the harmless error standard enunciated in *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (*Lusietto*, 41 Ill. App. 3d at 208), which requires us to determine whether

it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 710-11, 87 S. Ct. at 828.) Recently, in *Yates v. Evatt* (1991), 500 U.S. 391, 114 L. Ed. 2d 432, 111 S. Ct. 1884, the Supreme Court had occasion to examine a jury instruction containing a mandatory presumption which unconstitutionally shifted the burden of proof of intent to the defendant. "The jury was told that 'malice is implied or presumed' from the 'willful, deliberate, and intentional doing of an unlawful act' and from the 'use of a deadly weapon.'" (*Yates*, 500 U.S. at 401, 114 L. Ed. 2d at 447, 111 S. Ct. at 1891.) Although we do not believe that the erroneous accountability instruction given by the judge in the case at bar created a mandatory presumption, *Yates* is helpful in appraising the weight to be given the error especially since defendant claims that it enabled the State to convict him without proving his intent. (See *Lusietto*, 41 Ill. App. 3d at 207-08 (where the State attempted to change its burden of proving the requisite intent to commit burglary to a different burden of proving intent to promote a burglary through the use of an accountability theory).) According to *Yates*, "[t]o say that an error did not contribute to the verdict is *** to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, 500 U.S. at 403, 114 L. Ed. 2d at 449, 111 S. Ct. at 1893.

> "First, [the court] must ask what evidence the jury actually considered in reaching its verdict. *** In answering this question, a court does not conduct a subjective enquiry into the jurors' minds. The answer must come, instead, from analysis of the instructions given to the jurors and from application of that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.
>
> Once a court has made the first enquiry into the evidence considered by the jury, it must then weigh the probative force of that evidence as against the probative force of the presumption standing alone. To satisfy *Chapman's* reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. Since that enquiry cannot be a subjective one into the jurors' minds, a court must approach it by

asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Yates*, 500 U.S. at 404-05, 114 L. Ed. 2d at 449, 111 S. Ct. at 1893-94.

■ Therefore, the "first step in determining whether [the accountability instruction] contributed to the jury's verdict is to determine what evidence the jury considered on the issue of intent, independently of the [accountability instruction itself]." *Yates*, 500 U.S. at 408, 114 L. Ed. 2d at 452, 111 S. Ct. at 1895.

Defendant's testimony that he fired the gun about three or four times just to scare Green clearly established his role as the principal wrongdoer. Although he testified that he sought only to scare Green, he admitted on cross-examination that he was not shooting "straight down into the ground" or "up into the air." He also admitted that he saw people behind Eric Green. Detective Tuider testified that defendant told him he "shot at the dude." Green testified that he felt the bullets passing by him. Robinson testified that he got out of the car, aimed the gun with his legs bent, and was not shooting at the ground. She also testified that there were bullet holes in her house. Banks and Coleman demonstrated how defendant was shooting with his arm extended. In addition, the medical examiner testified that Tammy Washington's wounds indicated that she was not hit by a ricochet bullet. Moreover, defendant admitted on cross-examination that he received the gun from Fleener, put it in a holster before they left for their destination, and checked to see if it was loaded. Defendant also admitted that when he got out of the car, he did not try to talk to Green, but just started to fire.

"The intent to commit a crime can be inferred from the conduct of the accused and all the surrounding circumstances. (*People v. Terrell* (1984), 99 Ill. 2d 427, 459 N.E.2d 1337.)" (*People v. Murray* (1990), 194 Ill. App. 3d 653, 657.) "To prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results." (*People v. Bartall* (1983), 98 Ill. 2d 294, 307.) For example, in affirming the murder conviction in *People v. Cannon* (1971), 49 Ill. 2d 162, the "court observed that the defendant 'intended to fire the gun and did in fact point it and shoot in the decedents' general direction. This act, done voluntarily and wilfully, is sufficient evidence of the intent requisite to constitute the offense of murder.' " *Bartall*, 98 Ill. 2d at 307.

■ *Yates* next instructs us to weigh the probative force of the evidence of defendant's intent against the probative force of the erroneous accountability instruction. As we have previously noted, the judge's remarks about the accountability instruction were made outside the presence of the jury. Further, defendant was never charged on a conspiracy theory. He claims, however, that the prosecutor indirectly argued accountability to the jury when he said that defendant was "responsible for" the shooting. Defendant also contends that the evidence about Fleener's anger toward Green in conjunction with the accountability instruction confused the jury in making the fine distinction between the intent required for murder as opposed to the intent required for involuntary manslaughter. The prosecutor stated to the jury, "you are here today to decide whether or not [Freddie Jefferson] is going to be held responsible, whether or not he is going to be held accountable for the death of Tammy Washington."

We find the prosecutor's use of the words "responsible" and "accountable" to be consistent with their commonly understood everyday meanings which could not have misled or confused the jury. Therefore, it does not appear that the prosecutor was arguing that Jefferson was liable as an accomplice. In fact, in his closing argument, the prosecutor, in addressing the issue of defendant's intent at length, emphasized that "[t]he name of this case is the People of the State of Illinois versus Freddie Jefferson *** this man is charged with the murder and you are to decide if he is to be held responsible for his acts." In weighing the probative force of the evidence relating to defendant's intent against the probative force of the accountability instruction, we hold the error to be harmless when viewed in light of all of the evidence and the arguments the jury considered on this issue. *Lusietto*, 41 Ill. App. 3d at 208.

II

Defendant also contends that certain of the prosecutor's remarks during closing arguments deprived him of a fair trial. He complains that the prosecutor misstated the elements of murder and that he improperly used evidence of his prior convictions to show his propensity to commit crime.

Defendant cites the following excerpt from the prosecutor's closing remarks in support of the first part of his contention:

> "[PROSECUTION]: If you look at all of that [testimony] it will show that all the pieces fit perfect, all the pieces show that he is in fact responsible for the death of Tammy Washington and should be held guilty for that—

[DEFENSE]: Objection, that is not the law.

\* \* \*

[PROSECUTION]: Look at the court reported statement \*\*\* and use your own common sense as to the intent of the defendant and remember it is not an intentional killing, it doesn't make any difference, it is a general intent crime if you know what you are doing can cause the death of somebody else, boom, you are guilty of murder—

[DEFENSE]: Objection, that is not the law.

THE COURT: I will sustain the objection and ladies and gentlemen, it will be my instructions that you will follow in this regard.

\* \* \*

[PROSECUTION]: [You were told] that the issue in this case is not who did it but what was intended. What was intended doesn't matter, what happened does, that is what the law says and you will read the instructions on that—

[DEFENSE]: Objection, that is not the law.

THE COURT: I will sustain the objection. Ladies and gentlemen, you will get my instructions and you are to follow my instructions."

In contrast, the State maintains that the prosecutor was stating, albeit "unartfully," the second prong of the Illinois murder statute, which provides in part:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

\* \* \*

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2).

"Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant (*People v. Pittman* (1982), 93 Ill. 2d 169, 176), considering the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. (*People v. Bryant* (1983), 94 Ill. 2d 514.)" (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187.) "[A]bsent a clear abuse of discretion, the determination of the trial court as to the propriety of such argument should be followed. (*People v. Smothers* (1973), 55 Ill. 2d 172.)" *Thompkins*, 121 Ill. 2d at 445-46.

■ This case does not present a situation in any way similar to the one in *People v. Starks* (1983), 116 Ill. App. 3d 384, 395-96, *appeal denied* (1983), 96 Ill. 2d 548, on which defendant relies, where the conduct was so pervasive and severe that it led the trial court ineluctably to conclude that "any improper argument that was not made and any improper tactic that was not used would seem to have been omitted by inadvertence rather than by design." In any event, the fact that the trial judge in the instant case sustained defendant's timely objections to the latter two of the three remarks at issue is sufficient to cure the error in argument. In addition, the trial judge instructed the jury, at the end of the case, to disregard all questions to which objections were sustained. In *People v. Harris* (1989), 132 Ill. 2d 366, 386, *cert. denied* (1990), 496 U.S. 908, 110 L. Ed. 2d 275, 110 S. Ct. 2594, the court held that where the trial judge sustained objections to eight out of nine of the instances of error alleged by the defendant, such action was sufficient to cure the error committed in argument to the jury. Moreover, here, the trial court properly instructed the jury on the elements of murder including intent, the element which the prosecutor was attempting to describe in his last two remarks. In addition, the prosecutor alluded to the anticipated instruction in the last of the disputed remarks. These factors may also be considered by the court in determining whether or not the claimed error is harmless. See *People v. Bell* (1983), 113 Ill. App. 3d 588, 601.

The other part of defendant's contention is that the prosecutor made the following improper statement to the jury regarding the defendant's prior felony convictions:

> "[Y]ou can use the facts that Freddie Jefferson is a 4 time convicted felon when you determine whether or not to believe him \*\*\*. If you are going to hire a baby sitter to watch your kids you check their background, you want to see whether or not you can trust them so when you determine whether or not you are going to trust or believe him from the witness stand consider the fact that he is a 4 time convicted felon."

Defendant claims that because a background check is designed to uncover information about performance as well as credibility, the prosecutor's analogy to such a procedure impermissibly allowed the jury to consider his prior convictions as evidence of his propensity to commit crime. The State correctly maintains that the defendant has waived any error by failing to object to the statement at trial. *People v. Bartall* (1983), 98 Ill. 2d 294.

■ Assuming *arguendo* that the defendant has not waived argument on this issue, we disagree with his contention. "It is a funda-

mental concept in our criminal justice system that evidence of past crimes is not admissible to prove the defendant's disposition to commit the crime charged. [Citation.] If a prior conviction is for a felony or a crime involving dishonesty, the trial court has the discretion to allow the conviction to be introduced into evidence to impeach the defendant if the trial court believes the prejudicial effect of the impeachment is outweighed by its probative value on the issue of credibility. [Citation.] Evidence of a conviction used to impeach a witness is not admissible if more than 10 years have elapsed since the date of the conviction or the release of the witness from confinement, whichever is the later date. [Citation.]" *(People v. Lawler* (1990), 194 Ill. App. 3d 547, 558-59, *aff'd* (1991), 142 Ill. 2d 548.) In the instant case, the felony convictions were less than 10 years old and the trial judge carefully considered the arguments of both parties before reaching his decision. In exercising his discretion, the trial judge allowed the State to read into evidence that the defendant was convicted of five felonies and the date of those convictions, but he prevented the State from disclosing the charge or the sentence.[2] Accordingly, we cannot conclude that the judge abused his discretion in finding that the probative value of defendant's convictions outweighed their prejudicial effect. Moreover, it is clear from the prosecutor's statement that the use of such evidence was proper in impeaching his credibility. Therefore, defendant's reliance on *Lawler* is baseless, as the prosecutor's remark in that case that "'if a person is willing *** to commit a felony, then the law presumes that he is willing to lie'" clearly distorted the law. *Lawler*, 194 Ill. App. 3d at 559.

### III

Finally, defendant maintains that the trial judge improperly assumed the role of an advocate by questioning him and commenting on the evidence. Specifically, he complains that the judge should not have questioned him about his mental state and his relationship with Joe Jefferson.

While "[i]t is an abuse of discretion for the trial court to assume the role of an advocate" *(People v. Murray* (1990), 194 Ill. App. 3d 653, 658), "[a] trial court has the right to question witnesses in order to elicit truth or clarify material issues which seem obscure as long as he does so in a fair and impartial manner." *(People v. Gross* (1988),

---

[2]Although the judge mentioned five felony convictions, the State elected to introduce only four into evidence.

166 Ill. App. 3d 413, 422, *appeal denied* (1988), 121 Ill. 2d 576, *cert. denied* (1988), 488 U.S. 854, 102 L. Ed. 2d 115, 109 S. Ct. 142.) Moreover, "[i]t is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice." *People v. Franceschini* (1960), 20 Ill. 2d 126, 132.

In *Franceschini*, for example, the court held that the trial judge's suggestion to the prosecutor, after both sides had rested, that evidence be offered on how the defendant gained entrance to an apartment, was proper. (*Franceschini*, 20 Ill. 2d at 131-32.) The trial court does not assume the role of prosecutor "merely because its unbiased and impartial questions elicit evidence material to the State's case." *Murray*, 194 Ill. App. 3d at 658.

Defendant cites the following questions propounded by the trial court judge:

"THE COURT: When did you learn of the fight with Joe and Eric Green?

THE WITNESS: Joe came over to Fleener's house.

THE COURT: What time was that?

THE WITNESS: Guess around 7:30.

THE COURT: Where is Joe today?

[DEFENSE]: Objection.

THE COURT: Overruled.

THE WITNESS: Last time I heard he moved to Milwaukee.

* * *

THE COURT: So at the present time you don't know where he is at?

THE WITNESS: No.

THE COURT: Now, from the time that you learned about the beating or the fight between Joe and Eric Green and the time of the actual shooting how many minutes transpired?

THE WITNESS: About 15 or 20 minutes.

* * *

THE COURT: Where was the gun obtained from or where did you get the gun?

THE WITNESS: From [Fleener].

THE COURT: Do you know where he got it?

THE WITNESS: He come out the bedroom with it.

THE COURT: What were your intentions in relation to Eric Green when you fired?

THE WITNESS: Just to scare him so he'd stop messing with Joe.

\* \* \*

THE COURT: Did you figure that he would know—get the meaning of that when you fired?

THE WITNESS: Yes.

THE COURT: Were you intending to inflict any injury on Eric Green?

THE WITNESS: No.

THE COURT: Were you angry when you fired?

THE WITNESS: I was a little upset.

THE COURT: Were you angry?

THE WITNESS: I would say yes."

These questions led to the following re-cross-examination by the prosecutor:

"[PROSECUTION:] This is the guy you treated as your brother?

[WITNESS:] Yes.

[PROSECUTION:] And you haven't talked to him since?

[WITNESS:] No.

[PROSECUTION:] Have you talked to him since your case was set for trial?

[WITNESS:] No.

[DEFENSE:] Objection.

THE COURT: Overruled.

[PROSECUTION:] Have you tried to talk to him?

[WITNESS:] No."

After several rounds of re-cross and redirect examination on this subject by counsel, the judge again questioned the witness.

"THE COURT: Did Fleener tell you whether Joe indicated who started the fight between him and Eric Green?

THE WITNESS: Yes.

THE COURT: What did Fleener tell you that Joe said?

THE WITNESS: He said that Joe said that it started over Eric Green's girlfriend.

THE COURT: Well, did he say who started the fight?

THE WITNESS: No.

THE COURT: Did he indicate what weapons were used in the fight, if any?

THE WITNESS: He said they wasn't no weapons used in the fight.

THE COURT: No weapons at all?

THE WITNESS: No."

With respect to the State's assertion, which was made for the first time at oral argument before this court, that defendant waived this issue, we note that although a standing objection would have been the preferred way of preserving the alleged error for appeal, defendant's objection at the beginning of the court's examination of the witness may have been sufficient. See *People v. Sprinkle* (1963), 27 Ill. 2d 398, 400-01.

■ The reason the judge gave for examining defendant was to determine the proper instructions to be given in the case. Despite his acknowledgement that the judge's questions "elicited no new testimony" "about [his] state of mind," defendant claims that "the court's interrogation improperly emphasized testimony which pointed to guilt and *** cast *** discredit upon *** a key witness for the defense. 'The witness had already testified to these facts on direct examination, and the matter was of importance only so far as it affected the credibility of the witness in the minds of the jurors.' " (*People v. Santucci* (1962), 24 Ill. 2d 93, 99.) However, *Santucci* is distinguishable from this case because there the court examined every witness and made hostile comments to the defense. *Santucci*, 24 Ill. 2d at 99.

*People v. Enoch* (1989), 189 Ill. App. 3d 535, *appeal denied* (1990), 129 Ill. 2d 567, relied on by the State, is also distinguishable. In that case the court questioned a witness in order to clarify his rapid, rambling and sometimes inaudible testimony. (*Enoch*, 189 Ill. App. 3d at 544, 546.) Although there is some indication in the record in this case that the judge could not hear defendant's answers during the redirect examination preceeding his questioning of defendant, these answers were immediately clarified by the judge, who stated a different reason for his questions; and although the judge's questions about defendant's mental state had already been covered by defense counsel, it appears that the judge was attempting to clarify the material issue of the defendant's intent. Therefore we cannot conclude that the judge was in error in his interrogation of the defendant.

■ As to the questions about his relationship with Joe Jefferson, defendant contends that they "further served to emphasize weaknesses in [the] defense and to cast doubt upon [defendant's] veracity." (*People v. Tyner* (1964), 30 Ill. 2d 101, 105.) However, *Tyner* is also distinguishable from the case at bar since there the court openly accused the witness of lying. (*Tyner*, 30 Ill. 2d at 104.) Defendant contends that the questions had "the effect of impeaching [his] testimony that Joe was like a brother to him and that he saw Joe practically every day." According to defendant, "[t]he impeachment value of

these questions was obvious to the prosecutor, who avidly pursued this line of questioning after it was suggested by the judge. Another result of the judge's examination was that it forced defense counsel to bring out that [he] was incarcerated, and had been for some time, in an attempt to rebut the inference that Freddie didn't care to talk to Joe." In fact, as previously noted, these questions led to several rounds of re-cross and redirect on this subject.

Assuming without deciding that the judge was in error in asking these questions, we are of the opinion that such error does not mandate reversal, given the exceedingly formidable evidence of defendant's guilt in this case and also because there is no indication that the judge's colloquy with defendant formed the basis for the jury's verdict. *Enoch*, 189 Ill. App. 3d at 544.

Defendant also claims that the court made the following improper comment to the jury:

> "There is no evidence whatsoever as to the physical condition of Joe Jefferson after the fight and the only testimony [in] the record is that he was crying when he was seen by the defendant."

According to defendant, this comment invaded the province of the jury whose function it is to determine the facts. In support of this argument defendant cites *Tyner*, in which the court stated:

> "Rarely, if ever, is a judge called upon to comment on the evidence during trial except where necessary in ruling upon its admissibility, and under no circumstances should he express an opinion as to its veracity, for this is the province of the jury, and any intimation of such nature, however slight, may carry great weight with the jury and could prove controlling." (*Tyner*, 30 Ill. 2d at 104.)

The State responds that the trial judge was merely explaining his ruling regarding the State's objection to the defense counsel's misstatement of the evidence. We agree.

■ Counsel for the defense told the jury that Joe Jefferson "was hit at least five times" and "was beaten so bad he couldn't get up." The State objected to this statement on the grounds that it was not supported by the evidence. At that point the judge made the remark in issue. Although Green testified that he hit Joe at least five times, it is clear that the judge was trying to prevent the defense from improperly arguing facts not in evidence as to Joe's physical condition after the fight. (*Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 933.) The defendant himself testified that he did not see any marks on Joe Jefferson. We believe the judge's remarks were neces-

sary to explain his ruling on the State's objection and were therefore proper. (See *People v. Stack* (1979), 71 Ill. App. 3d 356, 362-63.) Furthermore, given the overwhelming evidence of guilt, even if the remark did constitute error, it would not require reversal since it was not "a material factor in the defendant's conviction." *Enoch*, 189 Ill. App. 3d at 543.

For all of the above reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.