FIRST DIVISION
December 22, 2008

No. 1-08-0161

| | | |
|---|---|---|
| CFC INVESTMENT, L.L.C., | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 04 L 24 |
| DANIEL E. MCLEAN, individually and | ) | |
| doing business as MCL COMPANIES, | ) | Honorable |
| | ) | Daniel J. Kelley, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE WOLFSON delivered the opinion of the court:

CFC Investment sued Daniel McLean for breach of a contract to purchase CFC's interest in a real estate venture. McLean answered that he never offered to buy CFC's interest. That is, there was no contract. The trial court entered judgment on the jury's verdict in favor of McLean. On appeal, CFC contends the trial court erred by (1) allowing parol evidence, (2) disallowing an admission McLean made at his deposition, (3) disallowing evidence of mismanagement, (4) refusing a proposed instruction on agency, (5) answering the jury's question, and (6) denying CFC's motion for a new trial or a judgment notwithstanding the verdict. We affirm.

FACTS

Some factual detail is required for an analysis of the jury's verdict.

In 1997 Peer Pedersen and Daniel McLean formed River East, LLC, to build residential and commercial buildings on land north of the

Chicago River near Lake Michigan in Chicago. A separate corporation, River East, Inc., with Daniel McLean as its president, managed River East, LLC. Those corporations set up a number of subsidiaries to develop separate parcels of the large tract. We will refer to the various River East entities collectively as River East.

River East paid various fees for management, development, marketing, leasing, and construction on the land to corporations McLean owned. Craig Duchossois and his father, Richard Duchossois, formed CFC Investments in 1997 to invest $10 million in River East. McLean, Peer Pedersen, Howard Warren, John Melk, and several others also invested in River East.

Pedersen and McLean convened a meeting of the investors on March 14, 2001. Pedersen and McLean assured the investors the development was proceeding well, with new investors seeking to participate. Craig offered to sell CFC's interest. Pedersen tried to persuade Craig that he should keep his investment in River East. But, according to Craig's notes from the meeting, Pedersen said he, Melk, and McLean, along with others, would be willing to buy out CFC's shares.

Craig wrote to Pedersen in April 2001, asking him to "consider this letter as [CFC's] request to initiate steps that would let us look at such a transaction." At the rate of return Pedersen and

McLean said they expected, CFC's shares should have had a value of $25 million. Craig repeated his request to sell CFC's interest in River East in a letter to Pedersen sent in June 2001. Craig added, "I understand *** that Dan [McLean] expressed an interest in joining with a group to acquire [CFC's] interest."

McLean, on July 31, 2001, wrote to Craig:

"Your ownership interest of 12.3% equates to a current value of $14,897,317 ***.

I recognize your desire to sell your interest in the River East development and I will work toward this goal. However, it is unlikely that an investor would pay the $25.2 million value requested in your letter. ***

*** I can pursue a buyout of your interest."

Craig telephoned McLean, and that call initiated further discussions about an appropriate price for CFC's interest in River East. They arrived at a price, and McLean confirmed that valuation in writing. On August 30, 2001, McLean wrote to Craig:

"I am willing to arrange for the purchase of your interest in the River East LLC for a price of $16,700,000. If this is acceptable to you please sign below. I will then commence to secure the capital for a closing date of November 30, 2001.

Sincerely,

                /s/ Dan McLean."

On September 21, 2001, Robert Fealy and David Filkin, acting on behalf of CFC Investments, met with McLean's representative, Kevin Augustyn, to discuss the details of the proposed transaction. Following the meeting Craig wrote, in a letter dated September 26, 2001:

"On behalf of CFC Investments, we accept your offer to acquire all of our interest in the River East project for $16,700,000. *** We also understand that, as part of this transaction, you will assist with having us removed as guarantors of the JP Morgan loan ***.

*** [W]e expect to close this transaction before November 15."

On September 28, 2001, McLean responded:

"I am happy to know you would like to accept our acquisition offer. ***

*** [W]e are hoping to close this transaction as quickly as possible.  However, as both Peer Pedersen and I stated originally, we require 90 days from the date of your acceptance of our offer.  This would give us up to January 1, 2002 if you acknowledge this letter by October 1, 2001. ***

Of course we understand your interest in being released as guarantor of the JP Morgan loan.  We expect to do this with the

repayment of your $5,000,000 pro-rata share of this loan, out of the proceeds you receive.

Assuming these two points are acceptable, please acknowledge by signing this letter below and returning it to me *** to effectuate this transaction."

Craig sent back a copy of the letter with his signature, along with a separate letter in which he said CFC agreed to the 90-day period "with the understanding that your group will do everything reasonable to accelerate closure."

Craig heard no word of progress over the following months. On March 29, 2002, he wrote to McLean, demanding performance of McLean's "contractual commitments." McLean did not respond. CFC hired an accounting firm to investigate the finances of River East.

On April 2, 2003, all of the investors in River East sold their interests to Mitsui Sumitomo Insurance Company for a total of $17 million. CFC received a little over $2.5 million for its share.

On January 2, 2004, CFC sued McLean for breach of contract. The court denied the parties' cross-motions for summary judgment. The court held that a trier of fact must decide whether the parties had reached a binding contract.

At a deposition, McLean testified that when he said he was "willing to arrange" for the purchase of CFC's interest, he meant that he would try to find a group of investors to purchase the

shares. He did not intend to offer to buy all of CFC's shares himself. CFC's attorney asked:

"Can arrange mean I am willing to arrange to get money so I can purchase your shares?

I mean, that's one possible interpretation of that language, isn't it?"

McLean answered, "I am sure it could be, somebody could interpret it that way."

CFC sought to introduce the statement in its case-in-chief as an admission. The court granted McLean's motion in limine to bar use of that response in CFC's case-in-chief, but the court added, "As far as what you may do on cross-examination that may be another issue."

McLean also moved to bar use of information derived from the 2002 investigation into the finances of River East. According to CFC's written offer of proof, it would show that McLean changed the plan to the detriment of other investors, he used corporate funds for personal expenses, he improperly accelerated payment of exorbitant fees to corporations he owned, he overvalued certain assets, he defaulted on some loans, and he artificially manipulated reported profits. CFC contended that the evidence helped establish that "CFC reasonably believed McLean himself offered to purchase CFC's interest because McLean wanted to keep his gross mismanagement

of the River East Project under wraps." The circuit court allowed CFC to present any evidence of mismanagement that surfaced before January 2, 2002, the date of the alleged breach, but it granted the motion to preclude any evidence of mismanagement that did not come to light until after that date.

CFC moved to exclude parol evidence at trial. The court denied the motion. The court noted for the record CFC's standing objection to all evidence admitted or disallowed due to rulings adverse to CFC on motions in limine.

Craig testified River East never sent him any of the promised annual audited financial reports. When River East again in 2001 failed to provide the statements Craig requested, he "had run out of patience, and [he] was convinced that [McLean] was not forthright." McLean had arranged for River East to pay above market fees to the corporations McLean owned. Because of his reservations about McLean, Craig sought to sell CFC's shares.

According to Craig's testimony, he believed McLean himself intended to purchase CFC's shares in River East. McLean had not identified any other investors intending to buy parts of CFC's interest. Craig had no doubt that by the letter of August 30, 2001, McLean offered to buy CFC's shares for $16.7 million. Craig understood the letter to mean McLean was willing to arrange financing for his own purchase of the shares.

McLean testified that in his correspondence from July through September 2001, he sought to establish a price CFC would accept for its shares so that he could approach potential investors with a specific proposal. He never said he would buy CFC's shares. McLean said Pedersen and Melk had expressed interest in buying some of CFC's shares.

Melk and Pedersen contradicted that part of McLean's testimony. Melk swore he never discussed with McLean the possibility of joining a group to purchase CFC's interest. Pedersen also testified he had no such conversations with McLean. In fact he specifically told McLean he and Warren did not wish to participate in any further acquisition offer.

Fealy and Augustyn testified about their meeting on September 21, 2001. Fealy and Augustyn agreed on the $16.7 million price, and they agreed Pedersen would complete the legal work for the transaction. According to Fealy, no one at the meeting mentioned any group of buyers, but Fealy admitted that Augustyn mentioned Pedersen and Warren as investors who might participate in purchasing CFC's shares.

Augustyn testified he and Fealy agreed Pedersen would contact the other investors in River East to see if they had any interest in increasing their stakes in the venture by buying out CFC. If those investors showed no interest, according to Augustyn, then McLean and

CFC would look to outside investors.

CFC asked the court to instruct the jury:

"An agent who signs his name to a contract but does not disclose the principal he is representing (which can be a person or a group) is personally liable for the obligations set forth in the contract that he has signed."

The circuit court refused the instruction. The court submitted a verdict form asking jurors: "Did CFC prove there was an offer by McLean to buy CFC's interest in River East, LLC for $16.7 million?"

During deliberations, the jurors sent the judge the following question:

"[W]hen you say did CFC prove there was an offer by McLean, does McLean have to mean McLean as an individual?"

Over CFC's objection, the court answered, "Yes." Shortly thereafter the jury returned a verdict in favor of McLean.

DECISION

I. Parol evidence

CFC contends the court erred when it denied the motion to bar parol evidence. McLean answers that CFC waived this and all other objections to rulings at trial. We find CFC preserved the issues with its argument on the motions in limine and by making a standing objection at the outset of trial. See People v. Jefferson, 227 Ill.

1-08-0161

App. 3d 491, 505, 592 N.E.2d 134 (1992). Insofar as CFC may have technically forfeited review of some issues, we choose to exercise our discretion to address them on the merits. See <u>Sinclair v. Berlin</u>, 325 Ill. App. 3d 458, 468-69, 758 N.E.2d 442 (2001). We review the court's decision concerning the admissibility of evidence for abuse of discretion. <u>Chapman v. Hubbard Woods Motors, Inc.</u>, 351 Ill. App. 3d 99, 105, 812 N.E.2d 389 (2004).

Illinois courts have adopted Corbin's statement of the parol evidence rule:

" 'When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.' " <u>Kelrick v. Koplin</u>, 73 Ill. App. 2d 63, 68, 219 N.E.2d 758 (1966), quoting 3 Corbin on Contracts §573.

To determine whether the parol evidence rule applies to a particular document, the court must first determine whether the document is a contract. <u>Kelrick</u>, 73 Ill. App. 2d at 68. A leading commentator explained:

"If the parol evidence rule rests on the rationale that a later written agreement has supplanted prior negotiations, it

-10-

follows that the rule does not come into play until the existence of an enforceable written agreement has been shown. Evidence of the negotiations between the parties should therefore be admissible to show that no agreement was reached." E. Farnsworth, Contracts §7.4, at 461-62 (1982).

If the parties have made a contract, the parol evidence rule applies if, but only if, the parties " 'assent[ed] to a particular writing as the complete and accurate "integration" of that contract.' " Kelrick, 73 Ill. App. 2d at 68, quoting 3 Corbin on Contracts §573. "Thus, our assessment of whether the parol evidence rule applies so as to exclude any extrinsic evidence depends upon a preliminary determination that the *** letter was a complete integration of the parties' agreement." Eichengreen v. Rollins, Inc., 325 Ill. App. 3d 517, 524, 757 N.E.2d 952 (2001).

Even when the parties have agreed to a written document as a complete integration of their agreement, the court may admit parol evidence, extrinsic to the document, to resolve ambiguities in the document. See Quake Construction, Inc. v. American Airlines, Inc., 141 Ill. 2d 281, 288, 565 N.E.2d 990 (1990); Lenzi v. Morkin, 103 Ill. 2d 290, 293, 469 N.E.2d 178 (1984).

CFC claims the parol evidence rule bars testimony concerning the parties' intentions and the course of negotiations, as well as evidence of correspondence between Craig and McLean's attorney,

Pedersen, prior to the signed and countersigned letter of September 28, 2001. For three independent reasons, we uphold the trial court's decision to admit parol evidence in this case: Parol evidence helped the jury decide whether the parties reached a contract; the documents relied on by CFC as the contract did not indicate complete integration; and the documents left ambiguities best resolved with the help of parol evidence.

CFC claims that McLean's signed letter of September 28, 2001, which Craig countersigned on October 3, 2001, became a binding contract for McLean to purchase CFC's shares in River East. McLean contended at trial that the document was not a contract, that he promised only to try to arrange for a group of investors to purchase CFC's shares for the agreed sales price. Buttressing McLean's position is the Duchossois letter of October 2, 2001, where he said: "Although neither Bob nor I were aware of any comments in regard to a 90-day period to resolve this issue, we are agreeable to this with the understanding that your group will do everything possible to accelerate closure." (Emphasis added.)

Nothing in the letters CFC construes as the contract shows an intention to make that particular set of letters an integrated agreement that would foreclose all reference to the course of negotiation for a complete understanding of the September 28 letter. The letter refers to "our acquisition offer," which, according to

1-08-0161

CFC, incorporated into the contract the proposed price of $16.7 million, stated in McLean's letter of August 30, 2001, for CFC's interest in River East LLC. Craig's letter of September 26, 2001, following the September 21 meeting, indicates that CFC agreed to that price, although neither party mentions that price in the September 28 letter. The letter of September 28 does not mention River East or the nature of the proposed transaction.

The defendant in <u>Lewis v. Loyola University of Chicago</u>, 149 Ill. App. 3d 88, 500 N.E.2d 47 (1986), sought to exclude correspondence that led to the signing of a written document, and the signed document there, like the letter of September 28, 2001, here, was not an integrated agreement because it lacked crucial terms of the agreement. The appellate court held the trial court correctly considered all prior correspondence leading to the written document:

"Where a contract is not expressive of the complete agreement and understanding of the parties, consideration of antecedent proceedings does not serve to vary the contract terms but exemplifies the terms of the agreement. Further, all relevant evidence may be considered to determine whether a particular writing is the complete agreement of the parties." <u>Lewis</u>, 149 Ill. App. 3d at 93.

Under the reasoning of <u>Lewis</u>, because the letters did not show an

-13-

1-08-0161

intent to make any particular set of documents a complete integration of the agreement, the trial court here correctly admitted into evidence testimony concerning the course of negotiations that led to the September 28 letter.

Moreover, the court should admit parol evidence to explain ambiguities in a written document presented as a contract. Harris v. American General Finance Corp., 54 Ill. App. 3d 835, 840, 368 N.E.2d 1099 (1977). The letter of September 28 refers to "our acquisition offer." McLean reminds Craig, "both Peer Pedersen and I stated originally, we require 90 days from the date of your acceptance of our offer." These phrasings introduce at least some ambiguity as to whether McLean alone, or McLean with Pedersen and some others, intended to make the acquisition offer. CFC itself relied on extrinsic evidence concerning the role of Pedersen and Augustyn to support its claim that McLean alone made the offer. By using such evidence, extrinsic to the letter, CFC effectively conceded the admissibility of parol evidence concerning the meaning of the letters it poses as the contract.

The ambiguity of the letters separately justifies the trial court's decision to admit parol evidence concerning the intentions of the parties. Both parties had the right to present parol evidence on the issue of whether the document qualified as an enforceable contract for the sale of the shares. See Oldenburg v.

-14-

1-08-0161

Hagemann, 207 Ill. App. 3d 315, 326, 565 N.E.2d 1021 (1991).

II.  McLean's admission

CFC contends the trial court should not have granted McLean's motion to bar use in its case-in-chief of part of McLean's deposition testimony.  At the deposition CFC asked McLean a series of questions about his statement in the letter of August 30 that he was "willing to arrange for the purchase of [CFC's] interest in River East LLC for a price of $16,700,000."  McLean agreed it was possible "somebody could interpret" the isolated sentence to mean McLean would arrange financing so that he alone could purchase the shares.  CFC sought to introduce the testimony as an admission.

"Any oral or written out-of-court statement by a party to the action *** which tends to establish or disprove any material fact in a case is an admission and is competent evidence against that party in the action."  Ficken v. Alton & Southern Ry. Co., 291 Ill. App. 3d 635, 647, 685 N.E.2d 1 (1996).  The admissibility of such statements of fact rests on the presumption that courts can usually rely on statements made against the speaker's interests.  Felker v. Bartelme, 124 Ill. App. 2d 43, 50, 260 N.E.2d 74 (1970).  The presumption does not make speculative or irrelevant statements admissible.  See Schall v. Forrest, 51 Ill. App. 3d 613, 615, 366 N.E.2d 1111 (1977); Moran v. Erickson, 297 Ill. App. 3d 342, 358, 696 N.E.2d 780 (1998).  Nor does the presumption permit testimony

-15-

1-08-0161

about legal conclusions. National General Insurance Co. v. Ozella, 17 Ill. App. 3d 703, 706, 307 N.E.2d 745 (1974). "[C]omments as to what 'might' have occurred *** generally are not admissions." Schall, 51 Ill. App. 3d at 615.

McLean's statement at his deposition amounts to no more than speculation as to how some reader might interpret one sentence in one of his letters. The guess has no greater weight than any other reader's guess about possible interpretations of the letter. The court barred CFC from using the statement in its case-in-chief, but specified the ruling did not foreclose use of the statement in cross-examination of McLean. We cannot say the trial court abused its discretion in imposing the limitation on the use of McLean's speculative comment as to how some hypothetical reader might interpret his letter. See Skonberg v. Owens-Corning Fiberglas Corp., 215 Ill. App. 3d 735, 749, 576 N.E.2d 28 (1991) (trial court did not abuse its discretion by restricting the defendant's use of parts of the plaintiff's deposition to impeachment).

III. Evidence of mismanagement

The court disallowed CFC's evidence of mismanagement of River East LLC because the evidence came to light after the date of the alleged breach. The court permitted CFC to present any evidence it had to support its theory that McLean made the offer in 2001 because he knew of allegations he mismanaged the corporation. CFC sought to

-16-

1-08-0161

persuade the jury that McLean offered to buy out CFC in a desperate effort to prevent investors from seeing the financial records that proved his mismanagement.

In LaSalle Bank, N.A. v. C/HCA Development Corp., 384 Ill. App. 3d 806, 893 N.E.2d 949 (2008), the plaintiff sought to introduce evidence that one of the defendants, a doctor, had a financial incentive not to refer his patients to a cardiologist.  Although the doctor eventually referred the patient at issue to a cardiologist, the plaintiff argued that the doctor delayed the referral due to the financial incentives.  The trial court disallowed the evidence.  The appellate court found no abuse of discretion, particularly because the referral, coming shortly after the doctor first reviewed the patient's chart (and the first time the examining doctor recommended such a referral), showed that the financial incentive had little effect on the doctor.  LaSalle Bank, 384 Ill. App. 3d at 822.  The appellate court in Estate of Parks v. O'Young, 289 Ill. App. 3d 976, 980-81, 682 N.E.2d 466 (1997), and Werner v. Nebal, 377 Ill. App. 3d 447, 455-56, 878 N.E.2d 811 (2007), similarly affirmed the exclusion of motive evidence where the potential of the evidence to confuse or mislead the jury outweighed its probative value.

CFC sought to introduce the evidence at issue to support its theory that McLean, without any other investors, had a motive to purchase all of CFC's shares.  The theory faces the stubborn facts

-17-

1-08-0161

that McLean did not pursue the purchase and he did not obstruct CFC's successful efforts to audit the financial records of River East. According to CFC, McLean himself provided the records that proved his mismanagement. The fact that McLean did not purchase the shares makes this case similar to LaSalle Bank. McLean argued that his corporations earned all fees River East paid them, and McLean personally committed no misconduct. CFC's proposed evidence would lead to a minitrial on a collateral issue that had strong potential to confuse the jurors and distract them from the central issue in the case. Here, as in Werner, the trial court permitted enough relevant evidence (concerning the lack of financial reports and Craig's suspicions) to allow the plaintiff to argue its theory to the jury. We cannot say the trial court abused its discretion by limiting the evidence of alleged misconduct to the matters known to either party before the date of the alleged breach of contract.

IV. Jury instruction

The trial court refused CFC's proposed instruction concerning an undisclosed principal. CFC assigns this ruling as reversible error. The trial court has discretion to decide which instructions to give the jury. We will not reverse the court's judgment unless it abused its discretion and seriously prejudiced a party's right to a fair trial. Frank v. Edward Hines Lumber Co., 327 Ill. App. 3d 113, 119, 761 N.E.2d 1257 (2001). The trial court should instruct

-18-

1-08-0161

the jury only on issues raised by the evidence.  Mack v. Anderson, 371 Ill. App. 3d 36, 56, 861 N.E.2d 280 (2006).

In the case at bar, when asked on the verdict form, "did CFC prove that there was an offer by McLean to buy CFC's interest in River East, LLC for $16.7 million?," the jury replied, "no."  CFC presented no evidence McLean worked for an undisclosed principal.  CFC consistently maintained McLean himself agreed to purchase its interest in River East.  Tellingly, CFC filed its complaint solely against McLean and its steadfast theory throughout trial was that McLean individually entered the contract.  McLean, too, presented no evidence that he acted as agent for any principal.  He said he tried, unsuccessfully, to arrange a group of investors to purchase CFC's interest.  No evidence supported the instruction CFC proposed; the trial court correctly refused it.

V.  Jury question

CFC objects to the answer the court gave to the question the jury sent during deliberations.

> "The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. [Citation.]"  People v. Millsap, 189 Ill. 2d 155, 160-61, 724

-19-

1-08-0161

N.E.2d 942 (2000).

The trial court followed the general rule.  The jury asked whether CFC had to prove McLean, as an individual, offered to purchases CFC's shares.  Because CFC sought to hold McLean personally liable, and it presented no evidence that he acted as agent for an undisclosed principal, the jury could hold McLean liable only on proof that McLean as an individual offered to purchase CFC's interest in River East, LLC.  We find no abuse of discretion in the court's correct response to the question.

VI.  Manifest weight of the evidence

Finally, CFC contends the evidence does not support the verdict.  It asks us to enter a judgment in favor of CFC, or to remand for a new trial.  This was a close case, but the evidence of the negotiations and the exhibits supports the jury's verdict.  The jury could have found the purported contract for the sale lacked at least one essential term: identification of the purchasers.  See WestPoint Marine, Inc. v. Prange, 349 Ill. App. 3d 1010, 1013, 812 N.E.2d 1016 (2004).  The jury obviously found McLean never made a binding offer to buy CFC's interest.  We will not second-guess the jury's verdict.  We cannot say the manifest weight of the evidence contradicts the jury's verdict.

For the reasons stated above, we affirm the judgment of the trial court.

1-08-0161

Affirmed.

R. GORDON, P.J., and HALL, J., concur.